345 F.2d 558
 Alfred B. BORNSTEIN and Ethel Bornstein
v.
The UNITED STATES.
Robert E. BORNSTEIN and Doris H. Bornstein
v.
The UNITED STATES.
William BORNSTEIN and Kate Bornstein
v.
The UNITED STATES.
ESTATE of Adolph KLEIN, Deceased, William Bornstein, Executor, and Jean Klein
v.
The UNITED STATES.
 No. 270-61.
 No. 271-61.
 No. 272-61.
 No. 273-61.
 United States Court of Claims.
 May 14, 1965.
 
 Gerald H. Sherman, Washington, D. C., for plaintiffs. Leonard L. Silverstein, Washington, D. C., of counsel.
 Thomas A. Troyer, Washington, D. C., with whom was Asst. Atty. Gen., Louis F. Oberdorfer, for defendant. C. Moxley Featherston, Lyle M. Turner, and Philip R. Miller, Washington, D. C., were on the brief.
 Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.
 COWEN, Chief Judge.
 
 
 1
 This is a suit for refund of income taxes, plus interest, arising from the distribution of certain funds by a corporation of which plaintiffs are shareholders. The defendant treated the distribution as ordinary income to plaintiffs, pursuant to 26 U.S.C. (I.R.C.1939) § 117(m) (1952 Ed.) [Collapsible Corporations]. Plaintiffs concede that the distributions were properly taxable under that statute as ordinary income unless the Commissioner of Internal Revenue is estopped or otherwise prohibited from assessing the deficiency because of his issuance of a prior inconsistent private ruling to a similarly situated corporation, and because of oral representations made by an employee of the Bureau of Internal Revenue. Plaintiffs have receded from the other contentions set forth in their petitions. The facts in these cases were stipulated by the parties and are incorporated in our findings of fact.
 
 
 2
 Plaintiffs are minority shareholders in Shirley-Duke Apartments, Section IV, Inc., and Shirley-Duke Apartments, Section V, Inc. They are not officers or directors of these corporations or of any of the Shirley-Duke group of corporations.
 
 
 3
 In June 1949, six corporations denominated "Shirley-Duke Apartments", and then bearing the additional designation of "Section I, Inc." through "Section VI, Inc.", inclusive, were incorporated in the State of Virginia. Their purpose was to own a single, multi-unit, apartment project that was to be constructed in the metropolitan Washington area. It was necessary to create six corporations (as opposed to a lesser number) because the lending institution had set a ceiling on the mortgage obligation of any one corporate entity. Shortly after incorporation, a parcel of land was purchased in Fairfax County, Virginia, and construction started.
 
 
 4
 Construction of apartment buildings for each of the six corporations was carried on as a single endeavor. Such construction proceeded with major regard to land topography, availability of materials, and other physical factors. Little attention was paid to the matter of which corporation's building was being constructed. Some costs were incurred by, and paid by, each corporation individually. Most costs were allocated among the various corporations based upon the percentage that the units in the particular corporation bore to the total units of all six corporations. Some persons were employed only by certain of the individual corporations, and not by all of the six corporations.
 
 
 5
 The construction of the apartment dwellings and their subsequent management were performed by a partnership formed by the principal stockholders in all of the corporations. The plaintiffs in the present action have never been members of this partnership.
 
 
 6
 A motive force in the formation of the Shirley-Duke corporations, a shareholder in all corporations, and general counsel of all of the corporations, was Mr. Carl Budwesky, a practicing attorney. Mr. Budwesky's offices are in a commercial building which is a part of the Shirley-Duke project.
 
 
 7
 By September 1950, all of the project was completed. It became apparent that the FHA insured mortgage funds received by each corporation would greatly exceed the corporation's actual construction costs. In informal discussions, certain shareholders of the various Shirley-Duke corporations expressed a desire to distribute the excess, and discussed the method of distribution, as well as the tax consequences thereof. They wished to be sure that the gain realized would be taxable as capital gains, and Mr. Budwesky advised them that this would be the treatment accorded.
 
 
 8
 In order to secure an authoritative opinion, Mr. Budwesky, at the behest of the shareholders and as legal counsel to all of the Shirley-Duke corporations, was authorized to secure a ruling from the Internal Revenue Bureau [now the Internal Revenue Service].
 
 
 9
 Accordingly, Mr. Budwesky had two conferences at the Internal Revenue Bureau with Mr. E. G. Parker and some of his associates regarding the possibility of obtaining a ruling from the Internal Revenue Bureau and the actual content of such a ruling.
 
 
 10
 Mr. Parker was a Conferee Reviewer in the Coordinating and Advisory Section of the Practice and Procedure Division of the Internal Revenue Bureau. His duties entailed the performing of research and analysis upon questions on which the Internal Revenue Bureau had been requested to rule. He also prepared initial drafts of such rulings. He had no authority to sign or otherwise to issue rulings on behalf of the Internal Revenue Bureau; that authority was confined to the head of his division, the Deputy Commissioner and the latter's assistant. Prior to their issuance by the Internal Revenue Bureau, all drafts of rulings which Mr. Parker prepared were required to be reviewed by at least two of his superiors. Mr. Parker never stated to Mr. Budwesky that he had authority to issue rulings on behalf of the Internal Revenue Bureau, and he never stated that he did not have such authority.
 
 
 11
 All of the work assigned to Mr. Parker during the period in question related to either the problems of capital gains or losses or to problems of business deductions. Mr. Parker had no specialized knowledge of any of the other areas of federal tax law, and his duties did not include any responsibility for work in such other areas.
 
 
 12
 In one of the conferences between Mr. Budwesky and Mr. Parker, Mr. Budwesky stated that he represented all six of the Shirley-Duke corporations and asked whether or not it would be necessary to apply for separate rulings for each of the six corporations. Mr. Parker advised him that, since the ruling would involve a legal determination, an application on behalf of one of the corporations would be sufficient and, since the same principle was involved, the ruling would be applicable to all of the six corporations.
 
 
 13
 Mr. Parker had no authority to make these statements, or to make any other statements or representations on behalf of the Internal Revenue Bureau about the applicability of its rulings. He had been given no authority to make, for the Internal Revenue Bureau or for the United States Government, any statements, either oral or written, about the law or its bearing upon particular situations. Mr. Parker's lack of authority to do anything of this character had been made clear to him by his superiors many times, and he was well aware of it. Mr. Parker never stated to Mr. Budwesky that he had such authority, and never stated that he did not have such authority.
 
 
 14
 On October 18, 1950, Mr. Budwesky submitted a formal written request for a ruling on behalf of the Shirley-Duke Apartments, Section III, Inc. The request made no reference to any of the other apartments.
 
 
 15
 On November 30, 1950, the Internal Revenue Bureau by the Deputy Commissioner, in response to the October application issued a ruling addressed to "Shirley-Duke Apartments, Section III, Inc.", hereinafter referred to as Section III. The ruling concluded that the distributions in question would be taxable as "long-term capital gains in accordance with the provisions of section 117(b) of the Internal Revenue Code [1939]." This ruling was never published.
 
 
 16
 Thereafter, Mr. Budwesky reported the oral advice given him by Mr. Parker to certain of the shareholders of the Shirley-Duke corporations. The directors of each of the corporations caused their corporations to declare and pay cash dividends in December 1950, and early in 1951. The corporate resolutions authorizing the distributions made no reference to the November 30, 1950, ruling of the Internal Revenue Bureau or to the oral statements made to Mr. Budwesky by Mr. Parker. No attempt to obtain a ruling upon the tax status of the distributions in the hands of plaintiffs was ever made by them or the corporations in which they held shares. No such ruling was issued.
 
 
 17
 The Internal Revenue Service allowed capital gains treatment of the distribution to the shareholders of Section III, Inc., because of the issuance of the letter ruling to that corporation. The distributions to the shareholders in the other Shirley-Duke corporations have been treated as ordinary income by virtue of 26 U.S.C. (I.R.C.1939) § 117(m) (1952 Ed.).
 
 
 18
 In April 1959, deficiencies were assessed by the District Director against plaintiffs on the basis that the distributions reported as capital gains in their tax returns for 1950 and 1951 should be taxed as ordinary income. Plaintiffs paid the deficiencies, and after their timely claims for refund were denied, they brought these actions.
 
 
 19
 Plaintiffs advance three general propositions as a basis for their recoveries in these suits.
 
 
 20
 First, plaintiffs maintain that they refrained from requesting a written ruling in behalf of the corporations in which they held stock, in reliance on the oral representations of Mr. Parker, the Internal Revenue Bureau employee. Consequently, they argue that the defendant's refusal to honor the Section III ruling with respect to the remaining corporations is inequitable and defendant should now be estopped to assert the deficiency against these other corporations. Although plaintiffs say that the representations were made by an agent who acted within the scope of his authority, their brief refers to and relies upon the common law concept of apparent authority.
 
 
 21
 It is a settled principle of law that the United States is not bound by the unauthorized acts of its agents, that it is not estopped to assert the lack of authority as a defense, and that persons dealing with an agent of the government must take notice of the limitations of his authority. Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); Utah Power & Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917); Byrne Organization, Inc. v. United States, 287 F.2d 582, 152 Ct.Cl. 578 (1961). An agent cloaked only with apparent authority cannot bind the United States for, as the court stated in United States v. Willis, 164 F.2d 453, 455 (4th Cir. 1947) —
 
 
 22
 "* * * He who deals with an agent of the government must look to his authority, which will not be presumed but must be established. He cannot rely upon the scope of dealing or apparent authority as in the case of a private agent."
 
 
 23
 Interstate Fire Insurance Company v. United States, 215 F.Supp. 586 (E.D. Tenn. 1963) Aff'd without opinion, 15 AFTR, 2d 017 (6th Cir. 1964) and Smale & Robinson, Inc. v. United States, 123 F.Supp. 457 (S.D.Cal.1954), which plaintiffs cite, do not support their position. In both decisions the courts found that the government agent involved was authorized to perform the acts which were relied upon to estop the United States. Thus, in Interstate Fire Insurance Company, 215 F.Supp. at page 597, the court stated:
 
 
 24
 "It therefore becomes a question of fact whether there was a redelegation in this regard to Agent McCoy. Under the proof in this case, the Court finds that Agent McCoy was authorized to do all that he did do with regard to the reallocation of expenses for the 1955 tax return."
 
 
 25
 Similarly, in Smale & Robinson, Inc., the court (at page 467 of 123 F.Supp.) found:
 
 
 26
 "* * * the agent by whose conduct the Government is sought to be bound acted within the limits of authority lawfully conferred, * * *."
 
 
 27
 In that case the court also recognized the rule that lack of authority is fatal to any claim of estoppel based on the conduct of an agent.
 
 
 28
 Since the parties have stipulated that Mr. Parker was wholly without authority to make the representations on which the plea of estoppel is based, we must conclude that the defendant is not estopped by the statements made by its agent.
 
 
 29
 Plaintiffs' second contention is also grounded on the doctrine of equitable estoppel. They assert that the distributions to plaintiffs were made in reliance on the ruling issued to Section III and that the Commissioner is now estopped to take a different position with respect to the other Shirley-Duke corporations, which are identical in all respects that affect the taxability of the distributions.
 
 
 30
 The full text of the rules for the application of estoppel against the Commissioner of Internal Revenue is far from clear. See e. g., Note 40 Va.L.Rev. 313, 329 (1954). However, the nuances of the case law need not be extensively explored in these cases, because plaintiffs have failed to show that the distributions in question were made in reliance on the letter ruling. Even if it may be inferred that there was reliance, plaintiffs have not established that they changed their position to their detriment in reliance on the ruling. Detrimental reliance is an essential ingredient of estoppel. Schuster v. Commissioner of Internal Revenue, 312 F.2d 311 (9th Cir. 1962); Knapp-Monarch Co. v. Commissioner of Internal Revenue, 139 F.2d 863 (8th Cir. 1944); Fruehauf Trailer Co., 42 T.C. 83 (1964).
 
 
 31
 The shareholders of the Shirley-Duke corporations had large amounts of cash on hand after the corporations had achieved the purpose for which they were organized. Nowhere in the stipulation can we find a statement that the distributions were made in reliance on the letter ruling to Section III, although plaintiffs insist that such reliance is to be inferred from the fact that their attorney, Mr. Budwesky, was authorized to seek a ruling in behalf of all of the corporations. No reference was made to the ruling in the corporate records when the distributions were voted. It is apparent that the shareholders were intent on distributing the cash on hand, and there is no showing that, in the absence of the ruling, an alternative and more beneficial course of action would have been taken. From the record as a whole, it cannot be said that plaintiffs have discharged the burden of establishing the presence of the elements that are necessary to estop the Commissioner.
 
 
 32
 Even if it is assumed that plaintiffs had relied to their detriment on the favorable ruling to Section III, the doctrine of equitable estoppel does not prevent the Commissioner from changing his position to correct an error of law. The principal case in this area is Automobile Club of Michigan v. Commissioner of Internal Revenue, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746, reh. denied, 353 U.S. 989, 77 S.Ct. 1279, 1 L.Ed.2d 1147 (1957). The Supreme Court there held that the Commissioner of Internal Revenue was not estopped from applying the revocation of a ruling retroactively, since the doctrine of equitable estoppel is not a bar to the correction by the Commissioner of a mistake of law.
 
 
 33
 In 1950, when the ruling was issued to Section III, the statute (Section 117(m) of the Internal Revenue Code of 1939) had been in effect for less than a month. More than 2 years elapsed before the Internal Revenue Bureau issued extensive regulations interpreting the new section. In addition, there were a number of court decisions which resolved legal problems that arose in applying the section with respect to FHA corporations.[1] Thus by 1959, when the deficiencies against plaintiffs were assessed, the Commissioner knew a great deal more about the law than he did when the 1950 ruling was issued. Under these circumstances, we hold that the Commissioner's change was a change in legal opinion which corrected an error of law.
 
 
 34
 Plaintiffs' final contention is that when the Commissioner of Internal Revenue decided to honor the ruling issued to Section III in behalf of that corporation only, the retroactive application of the Commissioner's change in position as to the shareholders in the other corporations was an unlawful discrimination between similarly situated taxpayers and an abuse of the Commissioner's discretion.
 
 
 35
 We think this issue must be decided adversely to plaintiffs in view of the rule announced in a number of cases which have considered the question. Weller v. Commissioner of Internal Revenue, 270 F.2d 294 (3d Cir.1959), cert. denied, 364 U.S. 908, 81 S.Ct. 269, 5 L.Ed.2d 223; Estate of Bennett v. Commissioner of Internal Revenue, P. H. Memo. T.C. para. 60253 (1960); Gerstell v. Commissioner, P. H. Memo. T.C. para. 62181 (1962), Aff'd, 319 F.2d 131 (3d Cir.1963); Goodstein v. Commissioner of Internal Revenue, 267 F.2d 127 (1st Cir.1959).
 
 
 36
 In each of the cited cases, the situation of the plaintiff, insofar as taxability was concerned, was identical to that of another taxpayer who had received a favorable private ruling. At the time the ruling was issued, each of the plaintiffs could have secured a ruling in his favor had he applied for one. Despite a showing of reliance on the ruling issued to another taxpayer, it was held in each case that the issuance of a private ruling to a particular taxpayer provided a sufficient basis for the Commissioner to apply a change in position retroactively as to taxpayers who had not received rulings. In Weller, supra, 270 F.2d at 298, the issue before the court was stated as follows:
 
 
 37
 "In disallowing the interest in these cases, the department relied upon Revenue Ruling 54-94, 1954-1 Cum. Bull. 53, which, of course, was issued after the taxable years in question. The petitioners contend that the Commissioner may not retroactively reverse his prior rulings which allowed similar deductions. The prior rulings had not been issued to the petitioners, for they had never requested any but were individual rulings in other cases. These individual rulings had been shown to petitioners by insurance company salesmen prior to the time of the purchase of the annuity contracts. Recognizing that they may not rely on these rulings directly, petitioners maintain that all taxpayers have the right to be treated equally and fairly and since they undoubtedly would have received similar rulings had they applied for them, they are entitled to their benefits."
 
 
 38
 In disposing of the taxpayers' contention, the court declared:
 
 
 39
 "Petitioners contend, however, that although the revenue ruling fails to indicate any limitation on its application, agents of the Treasury have stated to Congress that it does not intend to apply the revenue ruling retroactively to individuals who have previously been issued rulings. We need not determine whether such action if carried out would be an abuse of discretion, for petitioners are not in the same position as those parties who have been issued rulings. They are entitled to the same treatment as all other taxpayers similarly situated, i.e., without rulings, no more and no less. This the Commissioner has afforded them."
 
 
 40
 The decisions of this court in Connecticut Railway & Lighting Co. v. United States, 142 F.Supp. 907, 135 Ct.Cl. 650 (1956) and Exchange Parts Company, Inc. v. United States, 279 F.2d 251, 150 Ct.Cl. 538 (1960) are inapposite.[2] In Connecticut Railway & Lighting Co., the Internal Revenue Service reversed a consistent administrative practice which had extended over a period of many years. In Exchange Parts Company, Inc., plaintiff, after paying excise taxes on rebuilt equipment for several years, applied for and obtained a ruling that the articles were not taxable. Also, there were widely published rulings declaring that the articles were not subject to the excise tax. In reversing his long-standing administrative practice in Connecticut Railway & Lighting Co. and revoking the published and private ruling in Exchange Parts Company, Inc., the Commissioner announced that he would apply his change in position prospectively only, but that he would not refund any taxes that had previously been paid. In both cases, this court held that it was an abuse of discretion for the Commissioner to apply his ruling retroactively, solely on the basis that plaintiffs had paid the taxes in question.
 
 
 41
 It follows from what we have said above that plaintiffs are not entitled to recover and their petitions are dismissed.
 
 
 
 Notes:
 
 
 [1]
 Burge v. Commissioner of Internal Revenue, 253 F.2d 765 (4th Cir. 1958); Glickman v. Commissioner of Internal Revenue, 256 F.2d 108 (2d Cir. 1958); Weil v. Commissioner of Internal Revenue, 252 F.2d 805 (2d Cir. 1958); Abbott v. Commissioner of Internal Revenue, 28 T.C. 795, Aff'd, 258 F.2d 537 (3d Cir. 1958); Mintz v. Commissioner of Internal Revenue, 32 T.C. 723, Aff'd, 284 F.2d 554 (2d Cir. 1960); Hartman v. Commissioner of Internal Revenue, 34 T.C. 1085, Aff'd, 296 F.2d 726 (2d Cir. 1961)
 
 
 [2]
 There are also controlling factual differences between these cases and International Business Machines Corp. v. United States, Ct.Cl. April 16, 1965, 343 F.2d 914. In that case the court applied Section 7805(b) of the Internal Revenue Code of 1954 in behalf of a taxpayer who had made prompt application to obtain a private ruling to the same effect as a ruling issued to another taxpayer, which manufactured and sold business machines that were similar in all material respects to the machines manufactured by plaintiff. In these cases, none of the taxpayers nor the corporations in which they are shareholders asked for rulings